UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RONALD MORALES, ET AL.,          :

          Plaintiffs,            :

V.                               :    CASE NO. 3:06-CV-1556 (RNC)

BRIAN ROONEY, ET AL.,            :

          Defendants.            :

<u>RULING AND ORDER</u>

Plaintiffs Ronald Morales and Ismael Hernandez III, former Bridgeport Fire Department ("BFD") fire inspectors, bring this action under 42 U.S.C. §§ 1981, 1983, and 1988 for discrimination and a hostile work environment in violation of the Fourteenth Amendment against six BFD officials and Bridgeport's Director of Labor Relations.[1]  The defendants are Fire Chief

---

[1] At oral argument on July 24, 2009, plaintiffs withdrew the 42 U.S.C. § 1985 claim.  They also moved to amend the complaint to add a § 1983 First Amendment retaliation claim.  That motion is hereby denied as untimely.  Plaintiffs did not move to amend until oral argument, after summary judgment was fully briefed and discovery complete.  Plaintiffs' complaint makes no mention of retaliation, plaintiffs took no depositions, and so during discovery the defendants had no notice of a retaliation claim.  Allowing plaintiff to amend after such undue delay would prejudice the defendants.  <u>See</u> FED. R. CIV. P. 15(a); <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 191 (2d cir. 2008) (leave to amend may be denied for undue delay or undue prejudice).  Before oral argument, it was unclear (1) whether plaintiffs are seeking to recover for their terminations and (2) whether acts prior to termination are being pursued as individual disparate treatment claims or as part of a hostile work environment claim.  At oral argument, the parties agreed that a disparate treatment termination claim has been adequately pleaded and plaintiffs' counsel confirmed that the pre-termination events are being pursued as a hostile work environment claim.  This decision analyzes the claims accordingly.

Brian Rooney, Deputy Fire Chief James Grace, Deputy Fire Chief
Thomas Connor, former Provisional Deputy Fire Chief Wallace
Thomas, Provisional Fire Marshal Bruce Collins, Deputy/Acting
Fire Marshall William Cosgrove, and Director of Labor Relations
Edmund Winterbottom.  Each defendant is sued in both his
individual and official capacities.

Defendants have moved for summary judgment.  For the reasons
that follow, defendants' motion is granted.

I.  Background

The record, viewed most favorably to the plaintiffs, would
permit a jury to find the following facts.  Plaintiff Morales, a
Hispanic male, was employed by the BFD from 1987 to 2008.  He was
hired as a firefighter and after several intervening promotions
was promoted to the position of provisional senior fire inspector
in 2000.  He was also the founder and president of the Bridgeport
Hispanic Firefighters Association ("BHFA"), an organization
dedicated to advancing the interests of Hispanic firefighters.
Plaintiff Hernandez, a Hispanic male, was employed by the BFD
from 1994 to 2006.  He was hired as a firefighter and was
promoted to fire inspector in 2000.  Hernandez was the treasurer
of the BHFA.

Plaintiffs were members of the Fire Marshal Division of the
BFD.  As fire inspectors, their primary function was to do
inspections which could take up 75% or more of their time.  Under

2

changes initiated by Chief Rooney in 2005, members of the Fire
Marshal Division had the following specific responsibilities and
duties, among others: (1) each member was required to be at work
by 9:00 a.m.; (2) fire inspectors were to leave the fire
department building to do inspections by 9:30 a.m. and return
before 4:15 p.m.; (3) each day before 4:30 p.m. all members were
required to e-mail Chief Rooney's aid, Charles Dimbo, a daily
work report, outlining the work they did the previous day; and
(4) fire inspectors were required to call in when coming in late
or sick.

In February 2008, Morales's employment was terminated along
with four other inspectors. Two of the five inspectors
terminated were Caucasian. The terminations were a result of an
investigation into the GPS monitoring of the inspectors'
vehicles.[2] The investigation revealed that Morales had numerous
unaccounted for work hours and made several misrepresentations in
his daily activity reports. Specifically, the report indicated
that from August 6, 2007 to October 8, 2007, he worked an average
of nine minutes a day doing field inspections, sent 32 false
daily activity e-mails, failed to conduct 96 assigned
inspections, and spent more than 30 minutes a day at unassigned

_____

[2] Another Caucasian inspector, Nicholas Novia, was
terminated in October 2008. Morales alleges that Novia was not
terminated until Morales requested Novia's GPS data as part of
his termination grievance. (Morales Aff. ¶ 8.)

3

addresses such as Dunkin Donuts, a local deli, city parks, and
other fire department offices. (Defs. Mem. Supp. Summ. J. Ex.
19.)

Prior to his termination, Morales was disciplined for
numerous infractions.  In July 2005, he received a two-week
suspension without pay for violating the absence control policy.
The suspension was later upheld by an arbitrator.  In November
2005, he was disciplined for failing to obey a superior officer,
obtain a complete uniform, turn in his identification badge while
on a prior suspension, and provide daily activity emails.  Though
Morales disputes some of the facts supporting the finding that he
was insubordinate, he accepted verbal warnings and a two-day
suspension in exchange for withdrawing his appeal of these
disciplinary actions.  In October 2006, Morales was demoted from
senior inspector to inspector and was suspended for fifteen work
days, for several instances of insubordinate behavior, spreading
false rumors, and creating a hostile work environment.  This
discipline was upheld in arbitration.  In January 2007, he
received a one-day suspension for failing to report for
attendance and for yelling at his supervisors.  He also received
a written warning for failing to follow procedures when
requesting outside training and for threatening superior officers

4

with this lawsuit.[3]  In June 2007, Morales was suspended for eight work days without pay for failing to e-mail daily activity reports for the entire year 2007.  Finally, in October 2007, he was suspended for thirty days without pay for rebellious and insubordinate conduct.[4]

Hernandez's employment was terminated on October 12, 2006, for multiple counts of insubordination.  The insubordinate acts included failure to e-mail daily activity logs, disregarding warnings about insubordinate behavior, disrespecting senior officers, reporting late to work, disrupting a meeting, accusing a supervisor of creating a "master/slave relationship," failure to leave the office by 9:30 a.m. to conduct inspections and failure to provide documentation for overtime payment requests.[5] Prior to his termination, in July 2005, he was suspended for ten days and received a verbal warning for violating the absence control policy.  He received verbal warnings for failing to obey orders, failing to follow uniform regulations, violating sick day

_____

[3] Morales has challenged these disciplines and as of the date of oral argument the arbitral decision was still pending.

[4] Morales admits that he was suspended for 30 days but contends, without citation to the record, that he was suspended for not returning to work after an arbitration hearing.

[5] At a hearing held on October 2, 2006, Hernandez, who was represented by counsel, was given an opportunity to refute the charges and elected not to.

5

rules, and failure to do assigned inspections.[6]  He lost a
vacation day for being AWOL from duty.  He received a five day
suspension for failing to e-mail his daily activity report and
failure to follow orders.  He received a three day suspension for
abuse of sick leave.  He also received a written warning for
failure to fill out a correct City Vehicle Policy form despite
several requests for compliance.

Chief Rooney, in consultation with the Labor Relations
Department, made the decisions to discipline and terminate both
plaintiffs.

In the spring of 2006, the Bridgeport Office of Labor
Relations investigated plaintiffs' numerous complaints of
discrimination, harassment and hostile work environment.  The
Labor Relations Department issued a report in August 2006, which
concluded that there was no evidence to support plaintiffs'
claims of harassment, discrimination or intimidation against
minorities in the Fire Marshal Division.  However, the Labor
Relations Department found that the environment in the Fire
Marshal Division is contentious, confrontational and
disrespectful.  According to the report, the contentious
environment began under the previous fire chief and was inherited

---

[6] During the month of September 2005, Hernandez worked only
one full day and seven half days and did not e-mail a daily
activity report to Captain Dimbo.  He also failed to perform the
inspections assigned to him.

6

by Chief Rooney.

A. Morales' Claims

Morales claims that he was terminated and exposed to a
hostile work environment on account of his Hispanic ancestry.
Morales relies on his affidavit, deposition testimony,
arbitration testimony and grievances.[7]  Morales' charges against
each defendant include the following.

Morales alleges that each fire department defendant is a
current or former member of the Bridgeport Firefighters for Merit
Employment ("BFME"), an organization of Caucasian firefighters
that, according to Morales, works to hamper the opportunities of
their minority coworkers.  The record contains no evidence to
support this assertion about the BFME and plaintiffs seem to
concede in their depositions that a person is not racist by
virtue of being a member.

1. Allegations Against Defendant Rooney

---

[7] In ruling on a motion for summary judgment, the court may
only consider facts that would be admissible in evidence.  See
Fed. R. Civ. P. 56(e); Rohman v. New York City Transit Auth., 215
F.3d 208, 218 n.6 (2d Cir. 2000).  Plaintiffs submit several
exhibits that do not meet this standard because they contain
hearsay or are irrelevant and therefore may not be considered.
These include Inspector Pittman's complaint to Chief Pettway,
"The Wrong Selection: Bridgeport Fire Chief Brian Rooney", the
Connecticut Commission on Human Rights and Opportunities decision
in Lorenzo Pittman's discrimination case, Pittman's papers in
support of his claims before the Connecticut CHRO, and Lorenzo
Pittman's e-mails to Cosgrove and Grace.  To the extent
defendants' motion to strike relates to these documents, the
motion is granted.

Morales alleges that since being appointed fire chief in February 2005, Rooney has targeted him for demotions, discipline and termination. Morales alleges that Rooney's discriminatory actions consisted of: "No communication, changes in my division, removing me as a supervisor, never discussing any changes in my work environment with me as a supervisor, never including me in anything, only speaking to the three Caucasian supervisors in my division." (Morales Dep. at 49.)

Regarding his demotions, Morales alleges that his supervisory duties were stripped away over time. After having full autonomy, he was required to report to another supervisor. He was no longer allowed to maintain records for employees he supervised, such as the roll book, day sheets, and overtime sheets. Instead, at about 9:05 a.m. and 4:25 p.m., Captain Dimbo would harass him by taking attendance of his staff. Morales has testified that he did not know whether Caucasian supervisor Leonard Bonaventura similarly experienced the stripping away of his supervisory duties.

Morales alleges generally that before Rooney implemented departmental policy changes, Rooney consulted with three Caucasian supervisors but not with him. Morales also alleges that Rooney met with Collins and three Caucasian supervisors about a new office computer program, but Morales was purposefully excluded from the meetings.

8

Morales alleges that Rooney and Collins denied him and others training opportunities on account of their Hispanic ancestry. In support of this allegation, he has testified that Collins, a Caucasian, attended the National Fire Academy with a department-owned vehicle, and Cosgrove, a Caucasian, attended the Fairfield County HAZMAT meetings and received overtime while at the meetings. In contrast, he, Hernandez, and Lorenzo Pittman, an African American, were not allowed to attend.

Morales alleges that he was disproportionately disciplined for failing to submit daily activity reports. On September 23, 2005, soon after the new rules went into effect, he was disciplined for failure to file daily activity reports. In June 2007, he was suspended for eight work days without pay for failing to e-mail daily activity reports for the entire year. He states that numerous Caucasian fire inspectors failed to file the daily e-mail activity reports but were not disciplined. He acknowledges, however, that defendant Collins was issued a verbal warning for failure to file daily activity reports and Bonaventura received a verbal warning for failure to file the reports for three and a half months.

Morales alleges that Caucasian fire inspectors such as Collins, Cosgrove, Bonaventura and Nicholas Novia engaged in the same misconduct he did yet were not disciplined. He states that Collins was not disciplined for foul language or manipulating the

9

overtime process. He alleges that Novia was not disciplined for leaving a mandatory meeting whereas he was disciplined for his behavior at the meeting.

## 2. Allegations Against Defendant Collins

Bruce Collins served as Morales' supervisor beginning in November 2000. Morales has testified that Collins denied him the right to work overtime as an outside inspector supervising pyrotechnics because of his Hispanic ancestry. Morales admits that Stephen Vitka, a Caucasian inspector, was also denied overtime. Morales has testified that Collins and Novia attended a pyrotechnics training session on October 26, 2005 to prepare for the next day's circus show and should have invited others to the training session.

Morales previously filed a grievance with the Labor Relations Board to contest Collins' overtime practices. The grievance was resolved in Morales' favor in a decision requiring that inspectors excluded from overtime be able to make it up before Collins had new overtime opportunities.

Morales alleges that Collins bullied him, spoke condescendingly to him, and was hostile only to him and Hernandez, the two Hispanics in the department. Morales recalls one incident when Collins physically made it difficult for him to leave a room. Morales alleges Collins acted out because Morales was "Hispanic and retaliatory stuff." (Morales Dep. at 111.)

10

Morales submits as evidence of Collins' anti-Hispanic animus

a letter written by Morales describing that Morales had heard

that Collins once denied Inspector Pittman's request for two

Latino fire investigators to assist him in an investigation into

a deadly fire.   The letter contains hearsay evidence that Collins

denied the request because the Latino inspectors "do not know

anything." (Pls. Mem. Opp. Summ. J. Ex. I.)

### 3. Allegations Against Defendant Grace

Morales alleges that Grace discriminated against him by

meting out discipline requested by Rooney.   Morales describes

Grace's discriminatory actions as: "His failure to conduct

and/or, when issues were raised to him about harassment by Chief

Rooney, to take a look at that independently; and he's never done

that." (Morales Dep. at 199.)

Morales suggests that it was discriminatory for Grace to

require Morales - and no other inspector - to meet with him,

Dimbo and Collins to go over August 2005 changes to Fire Marshal

Division rules.   Morales further suggests that it was

discriminatory for Grace to respond to Morales' complaint about

the meeting with a request for a detailed description of how each

rule change constitutes "intimidation" and "coercion."

### 4.   Allegations Against Defendant Connor

Morales alleges that Connor added to the hostile work

environment by being involved with the GPS monitoring that led to

11

his termination.  Morales contends that Connor: "was another agent acting on behalf of the Chief, part of this GPS processing problem and a member of Bridgeport Firefighters for Merit Employment, part of that benefiting from provisionalships and the 'good-ole-boy network.'" (Morales Dep. at 201.)

   5.  Allegations Against Defendant Thomas

   Morales alleges that Thomas added to the hostile work environment by not taking action against the unfair pyrotechnics overtime policies promulgated by Collins.

   6.  Allegations Against Defendant Cosgrove

   Morales alleges that Cosgrove added to the hostile work environment by taking an active role in his discipline.  Morales alleges that Cosgrove bypassed disciplinary procedure by writing violation reports about Morales and giving them directly to Rooney.

   7.  Allegations Against Defendant Winterbottom

   Morales alleges that Winterbottom, Bridgeport's Director of Labor Relations, knew of the hostilities Morales was subjected to but took no steps to remedy his work environment.  Morales sent Winterbottom letters complaining about his work conditions and cc-ed him on several grievances he filed with his department.

B. Hernandez's Claims

   Hernandez claims that he was terminated and subjected to a hostile work environment on account of his Hispanic ancestry.

Hernandez relies on his deposition testimony and grievances.

### 1.  Allegations Against Defendant Rooney

Hernandez alleges that Rooney added to the hostile work environment by being a racist.  He has testified that Rooney was disciplined in 1999 for accusing minorities of cheating on a promotion exam. Hernandez also describes an incident when Rooney and Hernandez entered a stairwell at the same time and Rooney sarcastically spoke about a "Mexican standoff."  Hernandez provides hearsay testimony that when Rooney referred to African-Americans, he would point to his black socks, and that Rooney offered to rent his apartment to a Caucasian woman but rescinded the offer upon learning the woman's husband was Hispanic.

Hernandez has testified that Rooney denied him the opportunity to be a member of the Hazardous Response Team. However, he admits that Pittman, a Black inspector, and Frank Gerardi, a Caucasian inspector, were denied the same opportunity. He alleges that Rooney denied him the opportunity to take fire instructor and fire officer courses.  He alleges that for five years he asked to do plans review before he was finally given the opportunity.  He claims that other fire inspectors who requested the opportunity after he did were given the opportunity before him.

### 2.  Allegations Against Defendant Collins

Hernandez alleges that Collins has "taken actions that have

13

hurt minorities and their advancement opportunities regarding moneys, educational endeavors." (Hernandez Dep. at 25.) He states that Collins had verbally assaulted him, cursed at him, and falsely accused him of being tardy and AWOL. Hernandez has testified that Collins only swore at Hernandez, Morales, and Pittman, all minorities. Hernandez alleges that Collins purposely bumped into him in the hallway. Hernandez has testified that Collins kept a log of incidents for which he believed Hernandez deserved discipline, thus resulting in "some character defamation in the office." (Hernandez Dep. at 37.) Hernandez admits, however, that Collins was never responsible for actually disciplining him.

Hernandez alleges that Collins' discriminatory employment actions affected his pay by denying him overtime opportunities, denying him HAZMAT response opportunities and denying him opportunities to perform plans review.

Hernandez alleges that Collins prevented him from enrolling in educational programs. Hernandez alleges that he submitted an application to the Department of Public Safety Office of Education to enroll in an arson investigation course and Collins called the department and requested his application be withdrawn. He also alleges that Collins prohibited him from competing for a spot in a fire investigation course. Hernandez alleges that Collins allowed inspector Rich Ballesteros to participate in the

14

competition the following year and the previous year Collins
allowed Napoleon Jenkins to participate.

In addition, Hernandez alleges that Collins took only Novia
and perhaps Bonaventura or Cosgrove to a pyrotechnics training
course but excluded other members of the division including
himself and Morales.

### 3. Allegations Against Defendant Grace

Hernandez alleges that Grace contributed to the hostile work
environment by ignoring Hernandez's complaints about the hostile
work environment and getting angry when Hernandez complained.

Hernandez also alleges that Grace purposefully prevented
Hernandez from attending a meeting between Cosgrove, Grace, and
Pittman about the HAZMAT team. Hernandez alleges that Grace
discriminated against him by forcing Hernandez to attend a
meeting at which three of his superior officers explained Chief
Rooney's August 2005 policy changes in a hostile manner.

### 4. Allegations Against Defendant Connor

Hernandez alleges that Connor contributed to the hostile
work environment by ignoring Hernandez's complaints. Hernandez
also alleges that Connor once threatened him, saying, "Well, I
will see you in court then." (Hernandez Dep. at 102.)

Hernandez alleges that Connor, Cosgrove and Robert
Petrucelli approached him in a harassing manner on his final day
of work. Hernandez filed a police complaint as a result of the

15

harassment.

### 5. Allegations Against Defendant Thomas

Hernandez makes no specific allegations about Thomas.

### 6. Allegations Against Defendant Cosgrove

Hernandez alleges that Cosgrove contributed to the hostile work environment by "assist[ing] in implementing a racist agenda by the fire chief." (Hernandez Dep. at 25.)

### 7. Allegations Against Defendant Winterbottom

Hernandez alleges that Winterbottom contributed to the hostile work environment by calling him a "fucking asshole" to Rooney. He alleges that Winterbottom never used these words to describe any other fire department employee. Hernandez also alleges that Winterbottom was made aware of the hostile work environment in complaints that Hernandez filed with his office beginning in 2000, but that Winterbottom ignored the complaints.

## II. Discussion

Summary judgment may be granted when there "is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In assessing the evidence, the court must review the record as a whole, credit all evidence favoring the nonmovant,

16

give the nonmovant the benefit of all reasonable inferences, and disregard all evidence favorable to the movant that a jury would not have to believe. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).

Plaintiffs' complaint, as clarified at oral argument, includes claims that the defendants have violated § 1981 and the Fourteenth Amendment, giving rise to a § 1983 claim, by terminating them and subjecting them to a hostile work environment because of their Hispanic ancestry.[8]  The complaint also asserts section 1988 claims.

A.  Section 1983 Claims

1.  Discriminatory Termination

For liability to attach under either § 1981 or § 1983, plaintiffs must establish that each defendant was personally involved in the discriminatory termination. See Back v. Hastings On Hudson union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62 (2d Cir. 2000).  It is unclear how defendants Collins, Grace,

_____

[8] Plaintiffs' § 1981 claims are brought against state actors and so are brought pursuant to § 1983. Jett v. Dallas Independent School District, 491 U.S. 701 (1989); Patterson v. Oneida, 375 F.3d 206, 224-25 (2d Cir. 2004). Discrimination claims brought under § 1981 and the Equal Protection Clause involve equivalent analytical frameworks and require a showing of intentional race discrimination. See Patterson v. County of Oneida, 375 F.3d 206, 225-26 (2d Cir. 2004). Similarly, hostile work environment claims under the Equal Protection Clause and § 1981 are analyzed according to Title VII law. Id. Accordingly, the claims will be analyzed in tandem.

17

Connor, Thomas, or Cosgrove can be held liable for plaintiffs'
allegedly wrongful terminations.  Rooney has stated in an
affidavit that he made the decision to terminate both plaintiffs
in consultation with the Labor Relations Department.  Viewing the
facts most favorably to plaintiffs, Rooney's consultation with
the "Labor Relations Department" could be construed as
consultation with defendant Winterbottom, the Director of Labor
Relations.  However, plaintiffs offer no evidence to support a
conclusion that any other defendant was involved in the
terminations.  Accordingly, summary judgment is granted on
plaintiffs' wrongful termination claims against all defendants
except Rooney and Winterbottom.

Employment discrimination claims brought under sections 1981
and 1983 are analyzed under the McDonnell-Douglas burden shifting
framework.  See Annis v. County of Westchester, 136 F.3d 239, 245
(2d Cir. 1998); Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d
Cir. 1988).  Under this framework, the plaintiff has the initial
burden of establishing a prima facie case of discrimination.  The
burden then shifts to the defendant to articulate a legitimate,
nondiscriminatory reason for the challenged action.  The
plaintiff has the ultimate burden of proving that the proffered
nondiscriminatory reason is a pretext for discrimination.

To establish a prima facie case of discrimination, a
plaintiff must prove (1) that he was treated differently from

similarly situated individuals, and (2) that the differential treatment was based on heritage, ancestry, or race. See Harlan Assocs. v. Inc. Vill. Of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). "To be similarly situated, the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)(internal quotation marks omitted). The Second Circuit has clarified that the plaintiff must establish "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). "[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlan Assocs., 273 F.3d at 499 n.2.

Plaintiffs both allege that they were terminated because of their Hispanic ancestry. Based on the record, plaintiffs have failed to establish a prima facie case of discrimination.

(a) Morales' Discriminatory Termination Claim

Morales presents no evidence that similarly situated fire inspectors were not terminated. In fact, he has conceded that he was one of six inspectors who were terminated after the GPS investigation into their daily activity revealed misconduct. Five of the inspectors, including Morales, were terminated in

February 2008; one was terminated in October 2008.  Three of the inspectors terminated were Caucasian.  This evidence demonstrates that Morales was treated the same as similarly situated fire inspectors.[9]

Morales has no direct evidence showing that his termination was motivated by discrimination.  The only evidence that Rooney may have been motivated by anti-Hispanic animus is Rooney's former membership in the Bridgeport Firefighters for Merit Employment and Morales' assertion that Rooney spoke only to Caucasian supervisors in his division.  Plaintiff's bare assertion that Rooney only met with Caucasian inspectors is not sufficient to overcome a motion for summary judgment.  See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).  Similarly, Morales submits no evidence that Winterbottom may have been motivated by anti-Hispanic animus.  The only evidence specific to Winterbottom is that he took no action in response to Morales' many grievances of a hostile work environment.  However, the Labor Relations Department, under Winterbottom's direction, did investigate Morales' complaints and found them to be meritless.

Assuming Morales has satisfied his minimal burden of establishing a prima facie case, defendants' uncontroverted

_____

[9] Even assuming that the Caucasian firefighter terminated in October, Novia, was terminated only after Morales requested Novia's GPS records, two of the other firefighters terminated in February were Caucasian.

20

evidence establishing that he was terminated for valid, performance-related reasons after a full investigation is more than sufficient to meet their burden.  To show pretext, Morales asserts generally that GPS systems can make mistakes.  But he points to no admissible evidence indicating that his GPS report was inaccurate or a pretext for his dismissal.  Accordingly, his claim fails.

      (b)   Hernandez's Discriminatory Termination Claim

Hernandez also fails to establish a prima facie case of discriminatory termination.  He presents no evidence that similarly situated fire inspectors were not terminated.  He points to no fire inspector who committed violations as frequently as he did but was not terminated.  His exhibits provide no evidence relating to a sufficiently similar comparator.  His counsel was unable to identify a similarly situated inspector at oral argument.  See Guerrero v. Conn. Dep't of Children & Families, 315 F. Supp. 2d 202, 210 (D. Conn. 2004)(granting motion for summary judgment where "the comparator did not have the history of past disciplinary problems that [plaintiff] had").

Hernandez contends that Rooney is a racist, but the only admissible evidence he offers in this regard is his own statement that Rooney once used the term "Mexican standoff" in his presence.  This remark is insufficient to support Hernandez's

assertion that he was terminated because of his ethnicity. Hernandez presents no evidence that Winterbottom terminated him because of his ethnicity. An isolated profanity directed toward Hernandez coupled with Hernandez's assertions that Winterbottom failed to act in response to his hostile workplace complaints are insufficient to support Hernandez's claim.

The defendants present uncontroverted evidence establishing that Hernandez was terminated for valid, performance-related reasons. The termination occurred as a result of numerous insubordinate acts following several suspensions and verbal and written warnings for other insubordinate behavior. Defendants' evidence is more than sufficient to rebut the extremely limited evidence Hernandez has to support his allegation of discrimination.

In sum, neither plaintiff has presented evidence showing that he was terminated because of his Hispanic ancestry. Therefore, their § 1981 and § 1983 discriminatory termination claims fail as a matter of law.

## 2.  Hostile Work Environment Claims

Plaintiffs assert that the seven defendants are liable for creating a hostile work environment. Courts considering § 1983 Equal Protection Clause and § 1981 claims use Title VII law in deciding whether a plaintiff has established a hostile work environment claim. See Jemmott v. Coughlin, 85 F.3d 61, 67 (2d

22

Cir. 1996). However, unlike Title VII claims, hostile work environment claims under § 1983 are cognizable against individuals. See Paterson, 375 F.3d at 226.

To establish a prima facie case of a discriminatory hostile work environment, "a plaintiff must produce evidence that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)(internal quotation marks omitted). Isolated instances of harassment ordinarily do not rise to this level. Id. "Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." Id. (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). A plaintiff pursuing a violation of § 1981 or denial of equal protection under § 1983 must also show that the discrimination was intentional. Patterson, 375 F.3d at 226-27.

Whether conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment is determined based on the totality of the circumstances. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The factors courts consider include the frequency of the discriminatory conduct, its

severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Id. at 23. The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

"[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to constitute a discriminatory hostile work environment. Harris, 510 U.S. at 21 (internal quotations and citations omitted). "For racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)(internal quotation omitted). But "[t]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 439 (2d Cir. 1999).

As with claims for disparate treatment, plaintiffs must demonstrate each defendant's personal involvement in creating a hostile environment to establish a viable claim against the

24

defendant in his individual capacity.  See Patterson, 375 F.3d at 229.  Personal involvement includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations were occurring.  See, e.g., Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

(a)   Morales' Hostile Work Environment Claims

There is no evidence in the record that defendants Grace, Connor, Thomas, Cosgrove and Winterbottom subjected Morales to discriminatory harassment.  Morales alleges that Grace harassed him by forcing him to attend a meeting at which the Chief's policy changes were reviewed.  On this record, it is unclear whether all fire inspectors attended similar meetings or the meetings were held with just Morales and Hernandez.  It is also unclear whether the meetings were held because Morales and Hernandez had lengthy records of insubordinate behavior or specifically to target them because of their Hispanic heritage. Even assuming plaintiffs were singled out for their ethnicity, this single incident is not severe enough to give rise to a cognizable claim for hostile work environment against Grace. Morales alleges that Connor was involved with the GPS investigation that led to his termination, Thomas failed to discipline Collins for his unfair overtime policies, and Cosgrove

recommended Morales be disciplined.  These are not allegations of
ethnic harassment and do not support Morales' claims that
discriminatory intimidation in the workplace was so "pervasive
and severe" as to alter his conditions of employment.  See Cruz,
202 F.3d at 570.  Morales alleges that Winterbottom failed to
follow-up on his complaints regarding hostile work conditions.
As discussed, Winterbottom did investigate Morales' complaints in
2006 and found them to be meritless.

Morales alleges that Rooney and Collins treated him
differently from other fire inspectors with regard to overtime
assignments, training opportunities and discipline.  But there is
no evidence establishing the truth of these allegations.  Morales
concedes that like him, Caucasian fire inspectors were
disciplined for failure to e-mail daily activity reports.  Though
the 8-day suspension that occurred in June 2007 may have been
more severe than the discipline his Caucasian coworkers received,
Morales' misconduct was more egregious--he had yet to submit a
daily work report in 2007.  He also concedes that like him,
Caucasian and Black fire inspectors were denied overtime
opportunities by Collins and prevented from attending the
Fairfield County HAZMAT.  He acknowledges that Collins was
ultimately penalized for his overtime policies.  On this record a
jury would be bound to find that Rooney's rules and regulations,
which Morales alleges led to the minimizing of his supervisory

26

responsibilities, applied equally to all fire inspectors.

Morales' only viable allegation of harassment against Rooney is that Rooney met with Caucasian supervisors about a new office computer program and changes to office policies and excluded Morales from the meetings. Rooney denies these meetings took place. Even if Morales was excluded from a meeting on one or two occasions, he is unable to point to evidence indicating he was excluded because of his ethnicity. These infrequent incidents are insufficient to support a hostile work environment claim.

Morales' alleges that on one occasion Collins refused to allow two Latino inspectors to assist in an investigation saying that Latino inspectors "do not know anything." (See Pls. Mem. Opp. Summ. J. Ex. I.) While such a remark is clearly offensive, Morales has not shown that it was so serious as to alter his employment conditions. See, e.g., Negron v. Rexam Inc., 104 F. App'x 768, 770 (2d Cir. 2004)(co-worker's use of racial epithet "on a handful of occasions . . . including once over the loud-speaker" was insufficient to establish hostile work environment).

(b) Hernandez's Hostile Work Environment Claims

Similarly, there is no evidence in the record indicating that defendants Grace, Connor, Thomas, Cosgrove and Winterbottom subjected Hernandez to discriminatory harassment. Hernandez has testified that Connor and Cosgrove approached him in a harassing manner on his last day of work, which led Hernandez to file a

27

police complaint. Hernandez offers no testimony regarding any details of the incident. Nor has the police report been provided. Hernandez's bare allegation cannot support a claim of a hostile work environment.

Hernandez has testified that he and Rooney entered a stairwell at the same time and Rooney sarcastically spoke about a "Mexican standoff." This isolated incident is not sufficiently "pervasive and severe" to alter Hernandez's conditions of employment. See Harris, 510 U.S. at 21. Hernandez's remaining allegations regarding Rooney's anti-Hispanic and racial bias are inadmissible because they are not based on personal knowledge. Moreover, even if this evidence were considered, the fact that Hernandez himself has never seen Rooney point to his black socks when referring to Blacks, nor heard Rooney spout anti-Hispanic slurs, suggests that the incidents were too infrequent to create a hostile work environment.

Hernandez's claim against Collins is better supported, but it also fails as a matter of law. Hernandez alleges that Collins verbally assaulted him, swore at him, purposely bumped into him in the hallway and falsely accused him of being tardy. Hernandez has testified that Collins only swore at minorities. However, Hernandez provides no evidence of anti-Hispanic comments, slurs, or jokes made by Collins. His deposition testimony suggests infrequent, isolated incidents of harassment that do not rise to

the level of a hostile work environment.  Furthermore, the Labor
Relations Department's independent investigation and report
concluding that Hernandez's complaints of a hostile work
environment were unfounded provides further support for the
conclusion that Collins cannot be found liable for creating a
hostile work environment in violation of section 1983.  Cf.
Collins v. N.Y. City Transit Auth., 305 F.3d 113, 115 (2d Cir.
2002)("Where an employee's ultimate termination depends upon, and
is allowed by, a decision of an independent and unbiased
arbitrator based on substantial evidence after a fair hearing,
the arbitration decision has probative weight regarding the
requisite causal link between an employee's termination and the
employer's illegal motive.").

This investigation also serves to undercut Hernandez's claim
that Winterbottom failed to act in response to his complaints.
As with the termination claim, an alleged failure to respond and
an isolated profanity directed toward Hernandez by Winterbottom
fail to demonstrate that Winterbottom contributed to a pervasive
and severe racially hostile environment.

Plaintiffs have not sustained their burden of demonstrating
that any single incident of harassment by an individual defendant
was extraordinarily severe or that the incidents considered in
the aggregate were sufficiently pervasive and severe to alter the
work environment.  See Cruz, 202 F.3d at 570.  Accordingly,

29

summary judgment is granted in favor of the individual defendants
on the § 1981 and 1983 claims.

B.  Claims Against Defendants in Their Official Capacities:
    Monell Liability

    Plaintiffs also bring § 1983 claims against the defendants
in their official capacities.  A suit under § 1983 against a
municipal officer in his official capacity is considered a suit
against the municipality itself, and therefore liability exists
only if there is a "policy" or "custom" of discrimination.
Monell v. New York City Department of Social Services, 436 U.S.
658, 690-91 (1978).  To show a policy, custom, or practice,
plaintiffs need not identify an express rule or regulation.  See,
e.g., Sorlucco v. N.Y. City Police Dept., 971 F.2d 864, 870 (2d
Cir. 1992).  It is sufficient to show that a discriminatory
practice was so "persistent and widespread" as to constitute "a
custom or usage with the force of law" or that a discriminatory
practice of subordinate employees was "so manifest as to imply
the constructive acquiescence of senior policy-making officials."
Id. at 870-71 (internal citations omitted).

    The record contains no admissible evidence from which a jury
could conclude that harassment or discrimination toward Hispanic
fire inspectors was so widespread that there was a policy or
custom of such harassment.  Though Morales and Hernandez both
assert that discriminatory practices were pervasive, their

30

assertions are conclusory, and they have failed to offer evidence to sustain their claims.  Morales could not identify a single offensive comment directed at him that suggested anti-Hispanic animus.  Hernandez identified only one sarcastic comment by Rooney regarding a "Mexican standoff," and the circumstances surrounding the comment are unclear.  Most of plaintiffs' allegations concern discipline, rule changes, lack of overtime opportunities and inability to participate in training, which affected fire inspectors of all races and ethnic groups. Plaintiffs provide no evidence that any official policy or custom caused them to be subjected to the denial of a constitutional right.

C.    Claims Pursuant to 42 U.S.C. § 1988

Section 1988(a) provides that the district courts shall exercise their jurisdiction over civil rights cases in conformity with federal law, where appropriate, or state law.  This section does not provide an independent cause of action.  See Moor v. Alameda County, 411 U.S. 693, 702 (1973).  If plaintiffs seek attorney's fees pursuant to section 1988(b), their claims also fail.  Pursuant to the statute, reasonable attorney's fees are awarded only to the prevailing party.  See 42 U.S.C. § 1988(b).

III. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is hereby granted.  The Clerk of Court is directed to

31

enter judgment and close the case.

So ordered this 31st day of March 2010.

/s/ Robert N. Chatigny, USDJ

Robert N. Chatigny
United States District Judge

32